IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP & CONSERVATORSHIP OF HAUBOLD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP AND CONSERVATORSHIP OF VICKIE ANN HAUBOLD,
AN INCAPACITATED AND PROTECTED PERSON.

RONALD L. HAUBOLD, APPELLANT,

V.

KAREN RASMUSSEN, GUARDIAN AND CONSERVATOR, AND
AMY R. SKALKA, GUARDIAN AD LITEM, APPELLEES.

Filed December 26, 2017.    No. A-16-1137.

Appeal from the County Court for Adams County: MICHAEL O. MEADE, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Michael J. Synek for appellant.

Amy R. Skalka, of Skalka & Baack Law Firm, L.L.C., guardian ad litem.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

MOORE, Chief Judge.

INTRODUCTION

Ronald L. Haubold appeals from the order of the county court for Adams County, which denied his petition to be appointed as guardian and conservator for his adult sister, Vickie Ann Haubold. The court instead appointed a neutral third party, Karen Rasmussen, as Vickie's guardian and conservator. We find that the court did not err in denying Ronald's petition to be appointed guardian and conservator and in finding it to be in Vickie's best interests to appoint a neutral third

- 1 -

party. However, we reverse the appointment of the appointed third party and remand the cause with directions to conduct further proceedings regarding her qualifications.

BACKGROUND

On May 27, 2016, Ronald filed a petition in the county court, asking the court to find that Vickie was incapacitated and that the appointment of a guardian and conservator was necessary or desirable as a means of providing continuing care and supervision of Vickie's person and property. Ronald asked that he be appointed as Vickie's guardian and conservator.

On May 27, 2016, the county court appointed Amy Skalka to serve as guardian ad litem for Vickie. Skalka subsequently filed a report with the court, but the report was not admitted into evidence at trial or included in the bill of exceptions. Although Skalka filed a supplemental transcript with this court, which included a copy of her report, we granted Ronald's motion to strike the supplemental transcript and, as discussed further below, have not considered the report.

Trial on Ronald's petition was held before the county court on October 12, 2016. At the start of the hearing, Ronald and Skalka stipulated that a guardianship and a conservatorship for Vickie was necessary. The court heard testimony from Ronald, Vickie, and their cousin, Mary Ann Ressel, and received various documentary exhibits, including copies of various background checks of Ronald, which showed that he has no criminal history, no entries on the relevant registries for child abuse or neglect or adult abuse or neglect, as well as his credit history.

Vickie is 61 years old. She is not married and does not have any children. She has not executed a power of attorney, authorizing anyone to act on her behalf. Ronald is Vickie's only sibling. Their parents are both deceased. Ronald did not testify as to his exact age, but he testified that he graduated from high school in 1967 and that he had been retired for about 8 years at the time of trial.

Ronald has lived in California since 2010. Vickie lived with her mother at a residential location in Hastings, Nebraska, until sometime in 2014, when her mother moved to a nursing home. Ronald and Vickie's mother died in December 2015. Approximately 6 months prior to trial, Vickie moved to a one-bedroom apartment in "Goldbeck Towers," which is "part of Good Samaritan Village" in Hastings.

After Ronald's retirement, while Ronald and Vickie's mother was alive, and before she moved into a nursing home, she and Vickie would spend winters in California with Ronald. He explained that they would stay with him in California from "before Thanksgiving to about April" and then he would spend three or four weeks in the summer with them in Hastings. Ronald was asked about his plans for Vickie's placement if he was appointed as her guardian. He testified that Vickie grew up in and was familiar with Hastings and could continue living there, but he indicated that Vickie could visit him in California during the winter months if she wanted to do so.

Ronald testified that he had a good relationship with Vickie. Ronald claimed that he had daily contact with Vickie, but he did not know she had moved to Goldbeck Towers until about 5 months after the move, stating she "made [him] believe she hadn't [moved]." Ronald stated he would not have supported the move at the time, if he had known, because the new apartment's location was farther away from places she used to be able to walk to, but he agreed that some of her needs were better met by her current living arrangement.

Ronald was asked about what funds Vickie has available for her support. He testified that she receives social security income and has "a nifty 300 Thrivent account" that he believed pays quarterly dividends. Guardian Angel Life Services (GALS) is Vickie's current payee for her social security income. The county court received copies of client statements for the checking account and savings account maintained by GALS for Vickie. GALS makes certain payments for Vickie's expenses.

Vickie maintains a separate checking account and a separate savings account at a bank in Hastings. Ressel was added as a co-owner to some of Vickie's accounts after Vickie's mother died, but she was removed as a co-owner of those accounts about a month prior to trial. The court received a copy of a bank statement from the savings account "listing [Vickie and Ressel] as co-owners" showing transactions on the account from March 16, 2015, through August 25, 2016. Although Ronald denied closing these accounts, Ressel testified about "bounced" checks written by Vickie on closed accounts.

Ronald testified that he became concerned that Vickie's money was being misappropriated or used inappropriately after noting a deposit into Vickie's savings account from a CD that had been cashed, as well as subsequent cash withdrawals from the account. Ronald felt that the interest rate on the CD had been higher than that on Vickie's savings account. He also felt that the subsequent cash withdrawals were not for Vickie's daily needs because the payments GALS makes for Vickie's expenses and the checking account she maintained personally were adequate for that. He also expressed concern about Vickie's reports that the cash withdrawals had been made at Ressel's request and that the money had been given to Ressel. Ronald did not know how Ressel might have applied any of these funds.

Ronald also testified about another CD worth $12,767.71 he assisted Vickie in cashing in 2014. According to Ronald, they found the CD when they "went through the leftovers of the safe" and took it to the bank to see if it was "a good one," which it was. After they found out from the bank "what the interest rate was on new CDs or any investment," Ronald told Vickie he could give her a higher rate of interest, and she agreed to cash the CD. Vickie cashed the CD and transferred $12,000 of the proceeds to Ronald and put the balance into her bank account. Ronald was still "holding" the proceeds for Vickie at the time of trial. Since Vickie cashed the CD, Ronald has been paying Vickie interest of $130 every 6 months. Ronald testified he was holding this money for Vickie because he was concerned that it might have been dissipated otherwise. Ronald admitted that he had intended to use Vickie's money to pay down a personal loan of his; however, he did not use the money in that way when he discovered that he could not pre-pay his personal loan. He was holding the $12,000 at a bank in California, and although he was receiving a lower rate of interest there than what he had agreed to pay Vickie, he was willing to comply with his agreement with Vickie. There was no agreement about when the money would be returned to Vickie, but Ronald testified that "anytime she wants the money, it's hers."

Ronald has been appointed by the county court as personal representative of his mother's estate. He and Vickie are the sole heirs. At the time of the guardianship and conservatorship trial for Vickie, Ronald was in the process of liquidating the assets of his mother's estate, including the house she had owned. He confirmed that once the sale was completed and the estate closed, Vicki would be entitled to a distribution of additional funds. He testified that closing was supposed to be

on November 3, 2016, and that he wanted to make sure a conservatorship for Vickie was in place before then so that any distributions to her would not be dissipated. Ronald agreed that once a conservator was appointed, the conservator would be entitled to have the $12,000 returned to Vickie's estate and that he would be willing to do so. Ronald denied that he was holding any other assets of Vickie's or that he owed her any additional funds.

Ronald has never previously served as a guardian or conservator and expressed his willingness to complete any required training. He was aware that the guardian ad litem had suggested in her report that the court consider appointing a third party as Vickie's guardian and conservator. Ronald had contacted the individual suggested by the guardian ad litem and testified that after doing so, he still wanted the court to appoint him as Vickie's guardian and conservator. Ronald testified that he wanted to be Vickie's guardian and conservator because she was his sister and he was "aware of what the issues are in this and how money seems to vanish from her accounts," which he hoped to prevent from happening again. He had spoken with Vickie and thought that she would be comfortable with him being her guardian and conservator. He felt he could still serve as such while living in California, testifying that "keeping track of the accounts is not a big thing no matter where you are." With respect to Vickie's "daily living needs," he felt that Vickie's transportation needs could be addressed through the purchase of bus passes or with assistance from people from her church as in the past. He also expressed his intent, if appointed, to provide Vickie with a spending allowance, similar to that currently provided by GALS, which she could spend on transportation and other shopping needs.

Vickie testified that she was supportive of someone being appointed as her guardian and conservator. She confirmed that she and Ronald talk by phone daily and stated that they "get along real good" with one another and that their conversations are "open." When asked if there was anything about her relationship with Ronald that caused her concern, Vickie testified that she was "concerned about his health anyway" and indicated that Ronald has "a little bit of a heart murmur" and "low blood [sic]" or "problems trying to keep his blood [sic] elevated at times." Vickie testified she felt "pretty secure" about Ronald's request to be the one appointed as her guardian and conservator. When asked if there was anyone else she thought would do a better job or that she would prefer to Ronald as her guardian and conservator, Vickie responded, "I think that he would make a good personal representative . . . of the family."

After presenting his evidence in support of Ronald's appointment, Ronald's attorney asked the court to "take judicial notice of the pleadings that are in the files (indiscernible) record," and the court agreed to do so. The items judicially noticed were not marked or made part of the bill of exceptions.

Skalka presented testimony from Ressel, who lives in Grand Island, Nebraska. Ressel's relationship with Ronald was "pretty good" but became strained while Ressel served as guardian and conservator for Ronald and Vickie's mother. Ressel expressed concern that Ronald would not be able to address Vickie's daily needs while living in California. She felt that Ronald "could handle" the "money that is coming for [Vickie]," but she did not know whether he would act more in Vickie's interests or his own.

Ressel has had a very close relationship with Vickie over the past few years. Ressel checks on Vickie almost every week, assisted her with the move to her apartment, and helped Vickie

secure an affordable cell phone through Ressel's own cell phone plan. Vickie reimburses Ressel each month for her share of the bill. Ressel was asked about the bank withdrawals referenced in Ronald's testimony. She testified that Vickie withdrew the money for her own use and never gave any of it to Ressel. Ressel was generally aware of what Vickie used the money for but knew that Vickie used some of her money to purchase a new television and table and chairs for use in her apartment after moving. Ressel ordered the table and chairs for Vickie, and Vickie paid her for them. Ressel denied conducting any transactions for herself on the accounts she had previously co-owned with Vickie.

While making his closing arguments, Ronald's attorney conceded that Ronald did not have priority for the appointments because Vickie had not resided with him for more than 6 months prior to the petition. He argued, however, that Ronald was the logical choice for appointment as Vickie's guardian and conservator because of their close, ongoing relationship and because Vickie had spent substantial time with Ronald in California prior to when their mother entered a nursing home. Ronald's attorney also noted that Ronald had been very forthcoming about the $12,000, was paying Vickie interest on it, and was very willing to turn it over when someone was appointed as guardian and conservator.

In her arguments to the county court, Skalka agreed that Ronald had been very forthcoming about the $12,000 but expressed her continued concern with Ronald "essentially playing the bank for his sister." She did feel that Ronald had Vickie's best interests in mind in wanting to be both her guardian and conservator. Skalka also expressed concern about Ronald's ability to help Vickie with day-to-day needs while living in California. Skalka informed the court that she had contacted Rasmussen with Fiduciary, Inc., as an option for a third-party neutral guardian and indicated that Rasmussen was willing to serve in that capacity.

On October 26, 2016, the county court entered an order, finding that (1) Vickie, while living fairly independently, does require the assistance of a guardian and conservator, (2) GALS currently serves as her payee and manages her monthly income, (3) both Ronald and Ressel have a legitimate interests in protecting Vickie and both have assisted Vickie in various ways in the past, (4) both Ronald and Ressel have the ability to assist Vickie, but there is conflict between them, and (5) Ronald lives in California a large portion of each year and cannot attend to Vickie's daily needs, which may increase over time. Accordingly, the court found that appointment of a neutral third party guardian and conservator would be in Vickie's best interests. The court found that Rasmussen should serve as Vickie's guardian and conservator, beginning with the date of the court's order.

ASSIGNMENTS OF ERROR

Restated, reordered, and consolidated, Ronald asserts that the county court erred in (1) considering information in a guardian ad litem report which was not offered or received into evidence, (2) appointing a third party as Vickie's guardian and conservator instead of Ronald, and (3) appointing a third party as Vickie's guardian and conservator without requiring the third party to submit the required background information checks.

STANDARD OF REVIEW

An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court. *In re Guardianship & Conservatorship of Kaiser*, 295 Neb. 532, 891 N.W.2d 84 (2017). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Id*.

ANALYSIS

Before addressing the assigned errors, we note that at oral argument, the guardian ad litem, Skalka, raised a jurisdictional issue not previously addressed in appellate briefing. Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matters before it. *In re Guardianship & Conservatorship of Forster*, 22 Neb. App. 478, 856 N.W.2d 134 (2014). This court has jurisdiction over final orders that are appealed within 30 days from their entry. See Neb. Rev. Stat. § 25-1912 (Reissue 2016).

Specifically, Skalka argued that because letters of guardianship and conservatorship had not been issued prior to the appeal in this case, the court's order of October 26, 2016, from which this appeal was taken, was not a final, appealable order. Skalka relies upon a case from this court which was not designated for permanent publication; *In re Guardianship & Conservatorship of Hunt*, No. 16-1044, 2017 WL 4791103 (Neb. App. Oct. 24, 2017) (selected for posting to court website). In that case, the county court entered an order finding that the appointment of a guardian and conservator was necessary and making the appointments of each. However, the order specified that the appointments would take effect upon the letters of guardianship and conservatorship being issued, which would occur after the filing of certain documents with the court and sending the appropriate forms to all interested parties. In addition, a subsequent order made clear that the appointees were acting in a temporary capacity as the requirements for appointment of permanent guardians and conservator were not yet complete. Accordingly, this court in *In re Guardianship & Conservatorship of Hunt* found that a substantial right was not affected until the requirements were completed and the letters issued.

We find that the order entered in the instant case is distinguishable from the order entered in *In re Guardianship & Conservatorhsip of Hunt*. Here, the order found that the appointed person shall serve as guardian and conservator, "beginning with the date of this order." The order made no mention of any further requirements necessary for the appointed person to act.

Proceedings for the appointment of a guardian and conservator are made pursuant to the Nebraska Probate Code, which proceedings are special proceedings within the meaning of Neb. Rev. Stat. § 25-1902 (Reissue 2016) (defining the three types of final orders). Thus, the question in this case is whether the order appealed from affects a substantial right under § 25-1902(2).

A substantial right is an essential right, not a mere technical right. *In re Guardianship & Conservatorship of Forster, supra*. Substantial rights under § 25-1902 include those legal rights that a party is entitled to enforce or defend. *In re Guardianship & Conservatorship of Forster,*

*supra*. If a substantial right is affected, an order is directly appealable as a final order even though it does not terminate the action or constitute a final disposition of the case. *Id*.

Numerous factors determine when an order affects a substantial right for purposes of appeal. Broadly, these factors relate to the importance of the effect on the right by the order at issue. *In re Interest of Noah B. et al.*, 295 Neb. 764, 891 N.W.2d 109 (2017). It is not enough that the right itself be substantial; the effect of the order on that right must also be substantial. *Id*. Whether the effect of an order is substantial depends on whether it affects with finality the rights of the parties in the subject matter. *Id*.

Here, Ronald instituted this action, requesting to be appointed as guardian and conservator for Vickie. The effect of the order appealed from denied Ronald's request, finding instead that it was in Vickie's best interests for a neutral third party to be appointed. Further, the order required that the third party begin acting immediately. The order was a final determination as to the rights that Ronald was attempting to assert in this action; i.e., that it was in Vickie's best interest that he be appointed as her guardian and conservator. Therefore, we conclude that the order affected a substantial right of Ronald such that it was a final appealable order and we have jurisdiction over this matter.

*Guardian ad Litem's Report.*

Ronald asserts that the county court erred in considering information in a guardian ad litem report from Skalka which was not offered or received into evidence.

As noted above, we struck the supplemental transcript with the guardian ad litem's report from the appellate record and have not considered it. A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered. *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017).

As to the county court's consideration of the contents of the guardian ad litem report, any comments made by Skalka at the hearing were not evidence. At a hearing, testimony must be under oath and documents must be admitted into evidence before being considered by the trial court. *In re Estate of Radford, supra*. And, while the court took judicial notice of the pleadings at the request of Ronald's attorney, this was not done in such a way as to allow for a meaningful appellate review of any documents that were judicially noticed. Papers requested to be judicially noticed must be marked, identified, and made a part of the record. *Id*. The trial court's ruling should state and describe what it is the court is judicially noticing. *Id*. Otherwise, a meaningful review of its decision is impossible. *Id*. We also note that the because some portion of the request for judicial notice was "indiscernible," we are unable to determine if Ronald's attorney asked the court to judicially notice anything other than just the pleadings on file. Regardless, testimony at the hearing was transcribed and the court did receive exhibits into evidence. The question before us is whether there was sufficient evidence in the record to support the court's determination without the guardian ad litem's report, and as discussed below, we conclude that there was.

*Appointment of Third-Party Guardian and Conservator.*

Ronald asserts that the county court erred in appointing a third party as Vickie's guardian and conservator instead of Ronald.

The persons eligible for appointment as guardian, as well as their respective priorities, are described in Neb. Rev. Stat. § 30-2627 (Reissue 2016). Section 30-2627(a) provides that "[a]ny competent person or the Public Guardian may be appointed guardian of a person alleged to be incapacitated." Additional relevant considerations are found in §§ 30-2627(b) and (c), which provide:

(b) Persons who are not disqualified under subsection (a) of this section and who exhibit the ability to exercise the powers to be assigned by the court have priority for appointment as guardian in the following order:

(1) A person nominated most recently by [methods having to do with powers of attorney and durable powers of attorney];

(2) The spouse of the incapacitated person;

(3) An adult child of the incapacitated person;

(4) A parent of the incapacitated person, including a person nominated by will or other writing signed by a deceased parent;

(5) Any relative of the incapacitated person with whom he or she has resided for more than six months prior to the filing of the petition;

(6) A person nominated by the person who is caring for him or her or paying benefits to him or her;

(7) The Public Guardian.

(c) When appointing a guardian, the court shall take into consideration the expressed wishes of the allegedly incapacitated person. The court, acting in the best interest of the incapacitated person, may pass over a person having priority and appoint a person having lower priority or no priority. With respect to persons having equal priority, the court shall select the person it deems best qualified to serve.

Similar provisions with respect to the appointment of conservators are found in Neb. Rev. Stat. § 30-2639 (Reissue 2016).

Contrary to Ronald's assertions on appeal, no one, including Ronald, has priority to serve as Vickie's guardian or conservator. Although Vickie had spent time in California over the winter months with Ronald in the past, the record does not show that she has done so since prior to sometime in 2014, when her mother moved into a nursing home. Thus, the record does not support priority under § 30-2627(b)(5). Accordingly, this is not a case of the court passing over someone with priority for appointment in favor of someone with no priority for appointment; nor is it a case of the court having made a choice between two individuals having equal priority for appointment.

In this case, Ronald is Vickie's only sibling and clearly cares about her welfare, as does her cousin, Ressel, who lives close enough to assist Vickie in ways that would be more difficult for Ronald, given that he lives in California. While Vickie indicated at trial that she felt "pretty secure" about Ronald's request to be appointed as her guardian and conservator, her responses at trial do not unambiguously reflect a wish to have him appointed instead of some other individual. With respect to any "distance" concerns, Ronald notes *In re Guardianship & Conservatorship of Mueller*, 23 Neb. App. 430, 872 N.W.2d 906 (2015), where this court affirmed the appointment of a daughter who lived in Kansas as guardian and conservator for her mother in Nebraska. However,

in that case, the daughter had statutory priority for appointment due to a power of attorney. The evidence in that case was sufficient to support finding that appointment of the daughter, rather than a neutral third party, as conservator was in the mother's best interests despite some animosity between the daughter and another individual. The daughter had been appointed temporary guardian during the proceedings and was already taking steps to properly manage the mother's property.

In this case, other than Ronald's actions to allegedly prevent dissipation of the $12,000 and obtain a higher interest rate on that money, this is not a case in which Ronald is already managing income for Vickie. The entity GALS was Vickie's payee for her social security income and was making various payments on her behalf. Other assistance was provided by Ressel who had Vickie on her own cell phone plan. And, in terms of distance, clearly California is considerably further from Nebraska than Kansas. Ronald may not have acted solely in Vickie's interest in the matter of the $12,000 from the cashed CD, but the record shows that he has been forthcoming with respect to this transaction and that the money has not been dissipated, which was one of Ronald's professed goals in holding the funds for Vickie. The county court did not cite any concerns over this transaction as a reason for not appointing Ronald. Rather, the court noted the fact that Ronald lives in California for a large portion of the year, making it more difficult for him to tend to Vickie's every day needs, which may increase over time, and that there is conflict between Ronald and Ressel.

The county court's decision that appointment of a neutral third party instead of Ronald as Vickie's guardian and conservator would be in Vickie's best interests is neither arbitrary nor capricious. A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *In re Guardianship of Benjamin E.*, 289 Neb. 693, 856 N.W.2d 447 (2014). A capricious decision is one guided by fancy rather than by judgment or settled purpose. *Id*. The record supports the court's decision to appoint a neutral third party.

However, other than her name and her affiliation with an entity referred to as Fiduciary, Inc., there is no evidence in the record about Rasmussen, the individual appointed by the court. Because there is no evidence in the record from which we can determine her competency or whether her appointment was in Vickie's best interests, we reverse and remand for further evidentiary proceedings regarding Rasmussen's qualifications. In addition, as argued by Ronald in his third assigned error, Neb. Rev. Stat. § 30-2602.02 (Reissue 2016) requires the filing of a report of a national criminal history record check before the signing of an order appointing a guardian or conservator. There is no evidence in this record that such had been done prior to the entry of the order.

## CONCLUSION

We affirm the county court's decision to appoint a neutral third party as Vickie's guardian and conservator instead of Ronald, but we reverse that portion of the court's decision appointing Rasmussen and remand for further proceedings concerning her qualifications to serve in that capacity.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.